Martha Erica. Madam Clerk, please call the next case. 115-1838, as followed by 115-1863, University of Illinois Hospital v. Workers' Compensation Com'n Martha Erica. Counsel, you may proceed. Good afternoon, Justices. Counsel, may it please the Court, Elizabeth Capiletti on behalf of the Employer United          Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I am Elizabeth Capiletti, University of Illinois. I would respectfully request that you reverse the decision of the Commission as it relates to accident and causation. The claimant bears the burden of proof to establish that her injury arises out of her employment. And when we're speaking to a rising error, we are speaking to the risk of injury connected to the employment. This standard applies whether we're speaking to a single identifiable injury, a repetitive trauma, or an aggravation of a pre-existing condition, whether it be through a single identifiable injury or repetitive trauma. In this case, the claimant alleges her repetitive job duties caused her carpal tunnel syndrome. Certainly, Dr. Fernandez testified that the claimant's job duties, specifically her repetitive hand duties, caused her carpal tunnel syndrome. The Commission noted it in its decision of Dr. Fernandez's opinion. There was a significant contributing effect from her work history to the development of her carpal tunnel syndrome. Now, Dr. Gonzales also sort of supported that conclusion, didn't he? Well, there is a note from Dr. Gonzales. There was one note where he said her work duties did not per se cause carpal tunnel syndrome. More likely exacerbated it. But there was an exacerbation. But it's unclear as to whether that exacerbation was an underlying condition of ill-being versus just pain. And I think that that's really where we ultimately get to. Because the Commission did not believe Dr. Fernandez's testimony as it related to causation. I mean, they were emphatic in their statements. They said that the credibility of Dr. Fernandez's opinion that petitioner's work activities caused her CTS complaints is severely compromised. And the weight entitled thereto is greatly reduced. They simply did not afford any weight to his real opinion as to causation. And they explained it in detail in their decision as to why. So why do they find in favor of the claimant, then? I have no idea. And that's why I think that the indisputable weight of the evidence, in fact, compels an opposite conclusion. Because they did find that Dr. Fernandez's opinion was severely compromised as it related to the actual cause of her carpal tunnel syndrome. What they came around to, though, was that in Dr. Fernandez's reports, I'm sorry, what they came around to was that the factors of consideration are less important with regard to the causal connection of her work activities to an aggravation of her preexisting carpal tunnel syndrome. So basically, they created a different standard as it related to an aggravation of her carpal tunnel syndrome. They didn't believe them when it came to causation. But for some reason, they decided that the standard that we use for causation isn't applicable with an aggravation of a preexisting condition. And I will submit to you that's just not the law. I mean, all of the competent medical evidence in this case indicates that the aggravation of her carpal tunnel syndrome was not caused nor aggravated due to her work duties. Both Dr. Goldberg and Dr. Papirsky stated that. Yeah, but that's not what Dr. Gonzales said. Dr. Gonzales said that it was an exacerbation, but he never stated as to whether or not it was an underlying condition of ill-being or just her pain. And Dr. Fernandez never provided an opinion as to an aggravation theory. His entire opinions are predicated on causation. There is no opinion as to an aggravation of a preexisting condition. Neither is there even with Dr. Gonzales, I don't believe, with his exacerbation. All he says is exacerbation. And again, is that the underlying condition of ill-being or is that merely just the pain? And I think that those are very different propositions. And I believe that that's how the commission eventually got to the finding that there was an aggravation of her preexisting condition. They seem to put weight on the fact that the claimant experienced a transient amount of pain. But I will submit to you that that's not the law. The law is that there must be some sort of aggravation to her actual underlying condition. I cite in the brief two cases, one lawless and the other wrong. And in lawless, we have that circumstance where the claimant is diagnosed with a hernia, but he has no pain. And he ought not to have surgery. So he subsequently goes to work, he's lifting an object, and he feels pain, and he has surgery. The commission denied the claim, and the Supreme Court affirmed that denial, stating, although the fact that pain is caused by a preexisting condition does not preclude a worker's compensation award, if the condition is aggravated or accelerated by employment, the claimant bears the burden of showing the condition was, in fact, aggravated by the employment. And the same standard is again spoken to by the Supreme Court in the matter of Wong. Again in Wong, the claimant had a preexisting back condition. He was walking through mud at work, and all of a sudden he started to feel pain from his preexisting back condition. No benefits were awarded by the commission, and the Supreme Court again upheld the denial of benefits. And in their decision, they made a distinction between an accident, which caused an aggravation of the underlying condition, versus merely experiencing pain or discomfort. And that's the only history here that's been provided by the claimant, is that she all of a sudden felt pain while using the work. But that's not an aggravation of her underlying condition of carpal tunnel syndrome. I mean, the commission was clear. They did not find causation based upon Dr. Fernandez's opinion. They felt his opinion was not to be believed as a way related to causation and her development of carpal tunnel syndrome. What they said was, we don't think that these factors are nearly important when we're talking about an aggravation of her preexisting condition and an aggravation of her carpal tunnel syndrome. But it begs the question, when they found that her work duties weren't repetitive, how is it that you get to finding that the repetitive trauma aggravated the preexisting condition? Because there is no medical evidence that her underlying preexisting condition of carpal tunnel syndrome was, in fact, aggravated. What do we make of your initial statement? You said that the commission found the credibility and weight of Fernandez's causation opinion was compromised and reduced. It nevertheless found that the claimant's carpal tunnel syndrome was aggravated by the work activities. Correct. I mean, that's exactly what the commission states. Well, couldn't they rely on the claimant's testimony in and of itself? No, I do not believe they can. So basically what you're saying is the commission says there's no causation. We don't believe Dr. Fernandez. Well, it said it was compromised and reduced. I don't know that they said that there is no opinion on causation, did they? No, no, no. They said it was compromised and reduced. Let's see what it says. The credibility of Dr. Fernandez's opinion that the petitioner's work activities caused her carpal tunnel syndrome complaints is severely compromised, and the weight entitled thereto is greatly reduced. It's caused, but couldn't they take it then and reject it as the cause, the primary cause? Couldn't they still take the opinion and support the argument that it exacerbated the preexisting condition? If there was actually testimony to that regard by Dr. Fernandez. But that was Gonzalez. He never provided testimony that the carpal tunnel syndrome was aggravated by work duties. I read it again. There is no testimony to that effect. He offered a letter in which he expresses an opinion that the claimant's bilateral carpal tunnel syndrome was most likely exacerbated by her repetitive activity while working in a, quote, janitorial capacity at the university hospital, and then placed her under work restrictions. He did that on December the 15th, I think, of 1999. And then the only evidence that it wasn't exacerbated by her work are Popersky and the other doctor that you had her examined by. Goldberg. Goldberg. And the commission didn't buy their testimony. Well, I disagree with that. I mean, I think the commission, in fact, reviewed their testimonies and found that their testimony, specifically Dr. Popersky and Dr. Goldberg, felt that the claimant was suffering from a systemic disease process, which was, in fact, borne out by Dr. Hershen, who did finally, on December 7th of 2007, diagnose her with seronegative rheumatoid arthritis. So I do think that they did afford some weight to both Dr. Goldberg and Dr. Popersky because they do, in fact, comment on the fact that their opinions are predicated on a preexisting condition, and that being her polyarthritis. And relative to, I want to go back to your comments about Dr. Gonzales and the exacerbation of her repetitive job duties, the commission did not find the claimant's job duties to be repetitive. They didn't find them to be repetitive. They, in fact, state pretty, in fact, that that was one of the reasons that they didn't put much weight on Dr. Fernandez's opinions. Do they have to be repetitive if the only thing she's claiming is that her work duties aggravated a preexisting condition of carpal tunnel? It would be some type of repetitive activity that causes the carpal tunnel, but if you have a work duty that aggravates that condition, why is that not compensable? Because the premise there is that it's a repetitive trauma. It's not just any sort of work duties. It is the nature of those work duties are repetitive in such a way to cause carpal tunnel. But did they really find that those duties caused the carpal tunnel? They did not. Goldberg didn't say that they caused the carpal tunnel. He said they exacerbated it. So if a person has the condition of carpal tunnel, but the work duties that they perform, although not repetitive in the sense that they cause carpal tunnel, but they are repetitive, aggravates that condition, why isn't that compensable? Because then you're creating two of them, which is exactly what the commission is doing. You're creating different standards. So for one standard, for the actual cause, you have to have a certain type of repetitive job duties that would be causing the carpal tunnel syndrome, force, flexion, frequency, that we looked at for carpal tunnel. But then all of a sudden that same standard is not applicable when we're talking about an aggravated condition. Well, why would it have to be, logically or literally? If you already have the condition, and whatever you're doing there, and the nature of your daily work aggravates or exacerbates it, why does it have to be to the extent that it would have caused it? Can it be aggravating just by doing it? Because I believe that that's what the law states, is that the standard is the same whether you're talking about a fundamental cause or whether you're talking about an aggravation, and that the proof must show that the aggravation of the preexisting condition in fact aggravated the underlying condition. Yeah, but you were saying it has to be, it has to cause it. Well, if you already have the condition and you, you know, you go to work and in the course of your duties you aggravate it, how much, why do you have to prove that it would have been sufficient to cause it in the first place to sustain the compensable injury and the aggravation to it? Because we're still back to the fundamental issue of risk in the rising out of component. There must be some type of risk that is connected and incidental to the employment. I mean, that's the whole issue about these, especially with regards to repetitive trauma and aggravations of preexisting conditions, that we're talking about medical testimony. It's not just, oh, my hand's hurt. Yeah, of course my hand's been hurt because I have a condition and I go to work and I move my hands. But is the fact that I move my hand doing anything that changes or aggravates the condition? All it does is cause some type of pain. And I think that the court has been clear that that's not enough, that you have to aggravate the actual underlying condition. And the aggravation has to actually come from the risk of employment. So the risk of employment in a repetitive job claim is the fact that the job duties are repetitive. And so in this specific case, the commission found that her job duties were not repetitive but were sporadic in a varied nature. I'm going to come up on something. Assume they are sporadic and of a varied nature. Does that mean that they cannot aggravate a preexisting condition? CISPRO turns around and simply says it will be a question of fact for the commission to decide as to whether an aggravation of a preexisting condition is a cause of the plaintiff's condition of ill-being or whether it relates solely to the underlying degenerative condition. So if this woman was capable of working, and she was, and evidently asymptomatic, and now she performs these duties as a janitor, although they don't satisfy repetitive, for repetitive trauma purposes, but they do in fact aggravate a condition of carpal tunnel syndrome, which no one disagrees she has. Everyone agrees she has carpal tunnel syndrome. That's not a dispute. Is it? Who says it? I think that Dr. Goldberg actually says it. Because I think that that goes down to the fundamental problem. What is really causing this neuropathy? What is causing her nerve disease? And there is an issue at the beginning. Is it really carpal tunnel syndrome? Is it a compressive disease? Or is it some sort of systemic disease process? And it takes years for them to figure this out. And finally they figure out, no, she has a systemic disease process, which appears to really be the cause of her problems, as opposed to what one would think of as a carpal tunnel syndrome problem, where there's a compression on her nerves. But it really has to do with her systemic disease process. And I think that that's what Dr. Goldberg does speak to, that her carpal tunnel syndrome That isn't what Dr. Popersky says, is it? Pardon me? Popersky says she's got carpal tunnel. When he first initially sees her, he says, look, based upon the EMG, it looks like she has carpal tunnel. But I'm not sure. I think there may be more going on here. I think there's a systemic disease process, which might actually be the cause of her problems, which is actually indicated in that very first EMG done in 1999. He says that some of her complaints, and the quote is, are suggestive of systemic process, which could be the cause of her carpal tunnel syndrome. So he's not disputing she has carpal tunnel syndrome. The argument with him is what caused the carpal tunnel syndrome. But I'm past that. Assume that it wasn't caused by work, but the aggravation was caused by work. Why is it against the manifest weight of the evidence for them to say that her current condition of ill-being is at least the aggravation of work is a cause of her condition? And that's all they have to say. I guess I'm not trying to be obtuse here. I'm truly asking, what do you mean by aggravation? I mean, aggravation has to be something of that either. Make something that's asymptomatic, symptomatic. So then you're back to the fact that also she's experiencing pain. And I'm saying the case law indicates there is a distinction between just experiencing transient pain and that's not enough. Ah, transient pain. When did it go away? She had periods where it did go away when she was seeing Dr. Iftikhar and she felt better afterwards. And then she came back in and she was complaining of all sorts of different types of problems, not just with her carpal tunnel. She was complaining of the numbness and her hands becoming blue and fatigue and malaise, which is why she then actually got that doctor person who then, after numerous years, diagnosed her with the underlying systemic disease process. 2008, she's examined by Goldberg. Correct. She tells Goldberg that he writes a history of having developed a spontaneous onset of weakness and numbness in both hands in October the 21st, 1999, while working, denied upper extremity symptoms prior to that date, currently complains of heavy, tired hands, numbness about the medium nerve distribution of both hands. He acknowledges that the EMG demonstrates moderate bilateral carpal tunnel syndrome and states that patients with carpal tunnel usually respond to release surgery. He opines that the carpal tunnel syndrome did not resolve by surgery and does not believe that the carpal tunnel is a work-related condition in October 1999. Believes that the neuropathy was caused by some rheumatologic problems, inflammatory, and some syndrome. He concludes that her bilateral carpal tunnel was neither caused nor aggravated by her work as a janitor. That's correct. But she introduces Gonzales, who says it was aggravated, it was exacerbated. So you've got Goldberg saying it's not aggravated, Gonzales saying it is, and the commission comes down on the side of Gonzales. I don't think the commission even mentions Dr. Gonzales' opinion. Well, it's the only thing they could have relied on once they said that Fernandez's opinion was seriously compromised. Correct, also because Dr. Fernandez never provided an opinion as to an aggravation of a preexisting condition, and I also think Dr. Gonzales had no idea what her work duties even were, and the commission, again, went back to the fact that they did not find them repetitive or sporadic. And I also think Dr. Gonzales only indicates that it was her pain that was increased by her work duties, and the case law is clear that that's not enough. There has to actually be some sort of aggravation or acceleration of the underlying condition in and of itself, not just the pain, and that's all we have here. That is her entire testimony, and her history actually was that she was having problems for six months. The last three weeks before October 21st of 1991, she was feeling... Your time is up. Okay, sorry. I've let you go beyond. You will have time to reply and also address... I can address that. Okay, thank you. Counsel, you may respond. Good afternoon. Please accord, counsel. My name is John Castaneda. I'm here on behalf of the claimant, Ms. Aragon. I'd like to respond initially to counsel's arguments on causation before I address my main argument. With regard to causation, the commission's decision indicated that they did not give much weight to Dr. Fernandez on the issue of whether or not Ms. Aragon's work activities were the actual cause of carpal tunnel syndrome. But the arbitrator made it clear that when he looked at whether or not her activities aggravated her carpal tunnel syndrome, the arbitrator and the commission found that these activities, though they were varied and though they were performed over a period of time, were sufficient enough to aggravate her condition such that on October 21st, 1999, her date of manifestation, she was required to seek medical attention for a problem pertaining to her hands, which occurred while she was doing her work activities. And the commission specifically noted that the claimant did not have any symptoms prior to her employment with the university, that she performed these activities for 10 years, and that it was while she was doing her work activity the symptoms arose. So it's my contention, and it was the commission's decision, that these work activities that she performed sufficiently aggravated her preexisting condition. As opposed to merely giving her pain. Correct. Correct. Because it's Ms. Capilouthi's argument is here you've got to show more than just some pain. You've got to show that there was an aggravation. You're saying the evidence supports aggravation, not merely a temporary pain. Correct. And as we noted in the Edward Hines precision case, there is no legal requirement that a certain percentage of the workday be spent on any particular task in order to meet the legal definition of repetitive trauma. And if you look at the testimony of Ms. Aragon, as well as the job description provided of a building service worker, otherwise known as a janitor, you see that her time is spent cleaning and servicing restrooms by hand, gathering and dumping water, washing walls, performing tasks on a daily basis of her, removing wax from floors, mopping the floors with both hands, cleaning bathrooms. When she had to mop, she had to pull a mop through a strainer and squeeze the mop with a hand lever. When she had to clean the bathroom, she had to clean the mirrors, floors, sweep and mop, all using her hands. And that activity, as well as her description of what she did at the time of the hearing, was sufficient for the commission to find that those activities are the type of which could aggravate her carpal tunnel syndrome such that they manifested on October 21st, 1999. I'm wondering what were to make of the commission or the arbitrator's decision, which was adopted by the commission, at least as the causation, because they didn't address causation. They affirmed and adopted everything else. The arbitrator writes, based on the foregoing, the arbitrator concludes that the credibility of Dr. Fernandez's opinion that petitioner's work activity caused her carpal tunnel syndrome complaints is severely compromised and the weight entitled thereto is greatly reduced. However, those factors are of considerably less importance with regard to the causal connection of her work activities to an aggravation of her preexisting carpal tunnel syndrome. And I read that to mean they discount Fernandez's opinion vis-a-vis the underlying cause of the carpal tunnel syndrome, but they do not discount his decisions when it goes to the question of whether her condition was aggravated by her work duties. And that's how I read it. And then they said, therefore, the arbitrator concludes that the petitioner's carpal tunnel syndrome complaints are causally connected to an aggravation of her carpal tunnel syndrome by her work activities over the years of her service with the respondent. And I agree. That is exactly what they found. And they also noted that they also, if you look in the record, Dr. Gonzalez, as you mentioned before, at 12-1599, also wrote a letter stating that in his opinion, the carpal tunnel syndrome was exacerbated by repetitive work activity. So what the commission did is they considered the opinions of Dr. Gonzalez, Dr. Fernandez on one hand, and then on the other hand were the contrary opinions of Dr. Kopersky and Dr. Goldberg. Well, we know Dr. Kopersky thought that Ms. Aragon's condition was from a systemic condition, but we later find out that through the testing and the anabolic testing that was done, she didn't have that underlying condition. And Dr. Goldberg made the same opinion. He thought that the carpal tunnel syndrome, which he did think she had, was also caused by some metabolic hormone or polyarthritis diagnosis. But again, later on, Dr. Herson's testing revealed that she didn't have the systemic condition. The only condition that anyone thought contributed to the carpal tunnel as an aggravation was her obesity, but none of these two doctors, either Goldberg or Kopersky, even relied on that. They thought she had some other systemic condition that was the cause of her carpal tunnel. So the commission weighed the medical evidence that was in the record and found that by the preponderance of the evidence, the claimant proved that her condition of carpal tunnel syndrome was aggravated by these activities that she performed as a building service worker. So I think there is more than sufficient evidence in the record that reasonably supports the commission decision on that issue. I would like to move on to my main point today, which is why the commission did not find that Ms. Aragon was permanently and totally disabled pursuant to Section 8F. We know that this Court has told us in the West End case, as well as professional transportation, that there are three ways to prove whether or not someone is permanently and totally disabled. One, the preponderance of medical evidence. Or two, that the claimant shows a diligent but unsuccessful attempt to find work. Or three, because of her age, her skills, her education, her training, and her work history, that there is no reasonably stable job market for which she is employable and then the burden would shift to the employer to show that such a market exists. Well, in this case, we don't have medical evidence that says she is permanently disabled. What we have is an orthopedic physician opining that she has been released to return to work on the sedentary to light restriction, more on the sedentary, with permanent restrictions of no lifting more than 10 pounds, limited forceful grasping and gripping, no use of ribatory tools, and no use of tools that would cause injury. Then we have the vocational opinion unrebutted by Mr. Balmonte, who is a vocational counselor, who opines that based on her age, her lack of transferable skills because all of her prior work was unskilled labor, her lack of any training, her work history, again, in these unskilled positions, her limited English speaking ability, limited literacy, that there is no reasonably stable job market for her and that she is permanently and totally disabled. The university offered her a position within her restrictions, and her own doctor said that the position of clerical assistant that was offered to her was within her restrictions. Correct, Your Honor. I absolutely agree with that. And then she decides to retire and not work. And the commission says, you voluntarily took yourself out of the job market, you chose to stay off of work and continue to receive benefits from the State Employees Retirement System. We conclude, therefore, you are not permanently and totally disabled. She could have worked as an assistant clerical. Well, I respectfully disagree because Mr. Balmonte was given the opportunity to address that position, and Mr. Balmonte specifically said that that position is not something that, I quote, The reason is because that position and minimum qualification required a high school diploma or equivalent. It also provided a 12-month training program. But if you look at the training program, the first month, it's department tours, orientation, meet key staff. Second month, telephone etiquette, troubleshoot calls, disseminate information to supervisors, basic computer training, and retrieve information. Months three to six, you're tracking absenteeism, monitoring FMLA usage, ensuring injury reports are completely and properly filed, file management training and performance department monitoring, and so on for the rest of the training. The 8 to 12 month says the advanced training is contingent on the aptitude of the individual as assessed during months one to seven. Mr. Balmonte specifically testified that that job is not compatible with the limited education of Ms. Aragon, who went to the sixth grade in Mexico, not compatible with her illiteracy of speaking the English language, not compatible with her work history of performing unskilled labor. And this court in Yellow Freight looked at what happens when an offer is made to someone who is required to have sufficient education to perform the job. In Yellow Freight, the individual was a dock worker, and he had secured a job on his own with some vocational help as a security guard. The employer wanted to offer a job that required a bachelor's degree. This court said, and it's clear, that the claimant was not qualified for the jobs offered by the employer because the claimant does not even possess a high school diploma. This is the same case. Now we're dealing with a job offer that is made one month before the case is going to trial. Over three years after she's at MMI, sometime after Dr. Fernandez gets causal, and all of a sudden we expect this individual to accept a position that is not compatible with her aptitude. Just as this court did in Yellow Freight, we can say, no, this is not a valid offer. This offer is not compatible with the abilities of Ms. Aragon. Can she physically do it? Possibly. Dr. Fernandez said yes, but also said, well, there's typing. We need to be careful. But can she do it with a mental aptitude required of the position? I submit to this court she cannot. Based on the unrebutted opinion of Mr. Belmonte, I ask this court to reverse that part of the decision and find that Ms. Aragon is permanently and totally disabled. Any questions? I don't believe so. Thank you, counsel. Just briefly, I wanted to respond to your question about the aggravation, and I did want to go back. You better not burn your time up. You better address his permanent total. Okay. I will go on permanent total. The university made a valid job offer to the claimant. Yes, the job was one that was created by the university. But they did so with the understanding that they were going to retrain her and give her new skills. And it wasn't just, you know, here's this job, come try it out. I mean, they came up with a very specific program for the job. The job offer was a clerical assistant learner program. The job offer fell within her medical restrictions, as Dr. Fernandez said, that she could go back to the job. The job offer contemplated 12 months of on-the-job training. The job identified monthly goals for the claimant. The job identified written evaluations on a quarterly basis. The job contemplated ongoing counseling with human resources during the entire training process to make sure that she could actually learn the skills that were necessary. The job, it was a legitimate job offer, and it was to provide the claimant with a new set of skills, an additional set of skills. And the claimant refused the job. She actually never even contacted the employer about the job. Instead, she did just continue to choose to receive her, and they were disability benefits from SCRS. Not only did she refuse the job tended by the employer, she also never looked for her own job. I mean, she was released and put at MMI and released by Dr. Fernandez in 2003. She never looked for a job during that entire period of time. Instead, choosing to receive her disability benefits from SCRS. And, yes, I appreciate Joe Belmonte's opinion, but his entire opinion is basically predicated on the fact that he believes her to be functionally illiterate. I mean, that was his opinion. But he also stated during the deposition that he said specifically, I want to state that I did recommend she undergo evaluation under the supervision of a skilled and certified vocational evaluator with someone specializing in testing to determine as reliable as, in a scientific manner, as possibly exactly what her spelling, word recognition, reading comprehension skills are. He asked that there be this specific testing because he couldn't, didn't know actually what her skills were. So he was basically just guessing that he felt that she was going to be unable to do this. But in fact, again, requested that he have the appropriate testing to actually formulate his opinion. And he also said during the testimony the best indication as to whether she could do the job was if she went and tried to do the job. And the claimant just chose not to do the job. She chose to stay at home and take, accept her disability benefits from SCRS. And, again, this was not a sham job offer. It was done with an intention of providing her and training her over a year period of time. And I know in Reliance Elevator they talk about sham job offers. And in that case, it was a case where the employer specifically took a job that was, the employee was making $10 an hour, converted a new job, a nonunion job, and started paying her. Actually, the commission's decision addresses this, and it gets a little bit more specific. Because they found that in this case the respondent also offered training to the petition to overcome her educational and language deficits. The Office of Training distinguishes the present situation from those cases where the employer offers positions merely for the purpose of avoiding liability. Now, they also indicate here in their decision, they're very specific about why they're not awarding it to her. Instead, respondent's offer seems to reflect a genuine desire to help petitioner return to the workforce with skills that could be transferred to another employer. And then find that, I mean, she didn't even respond to them, and then took herself out of the workforce. And that's their finding. I mean, this is a specific finding, that the offer was a legitimate offer, as opposed to all the cases that dispute that, based upon the fact that the person just simply can't do what they're being offered to do. I agree. Well stated. So, if you have no further questions, I would ask that you reverse the decision as asked, accident causation, but if not, affirm the award of permanency. Thank you. Thank you, counsel. Any reply to you? Just briefly, your honors. I understand that it's difficult to make the decision that this job was not something that was a sham, and was actually a valid pro-offer to Ms. Aragon. You have to understand the context, though. The context is that this case was denied, and she was never authorized any treatment, and was not receiving any benefits. So, we can continue to say she chose to accept disability, or chose to retire, but she really had no choice. She wasn't getting paid. There was no other benefit she was receiving. And because she was at MMI in 2003, and we get a job offer in 2005, two years later, to say that that apparently was an attempt to help her or get her back into the workforce, none of the testing that Mr. Balmonte was recommending was ever authorized. She never got the chance to find out what she could do in terms of her abilities of spelling, or testing, or any of that. Nothing was authorized. Nothing was done. And now, because two years later, she doesn't agree to accept this position, now we say she chose to be disabled. I respectfully disagree with that argument, and again, ask you to reverse. Thank you. Thank you, Counsel Bull, for your arguments in this matter. We'll be taking them under advisement. I write this position shallowly.